[S.F. No. 22841. In Bank. May 24, 1972.]

PAOLO RAFFAELLI, Petitioner, v.
COMMITTEE OF BAR EXAMINERS,
THE STATE BAR OF CALIFORNIA et al., Respondents.

## COUNSEL

Paolo Raffaelli, in pro. per., for Petitioner.

Kenneth D. McCloskey for Respondents.

## OPINION

**MOSK, J.**—By this application for original writ, petitioner Paolo Raffaelli seeks to compel respondent Committee of Bar Examiners to certify him to this court for admission to the practice of law.

The sole ground upon which respondent has refused to certify petitioner

is that he is not a citizen of the United States. The question for decision, accordingly, is whether the statutory exclusion of aliens from the practice of law in this state (Bus. & Prof. Code, § 6060, subd. (a)) constitutes a denial of equal protection of the law (U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 11, 21). In the light of modern decisions safeguarding the rights of those among us who are not citizens of the United States, the exclusion appears constitutionally indefensible. It is the lingering vestige of a xenophobic attitude which, as we shall see, also once restricted membership in our bar to persons who were both "male" and "white." It should now be allowed to join those anachronistic classifications among the crumbled pedestals of history.

Petitioner is a 36-year-old native-born citizen of the Republic of Italy. In 1959 he entered the United States as an exchange visitor. At the completion of the exchange program he returned to Italy for a brief period, then reentered the United States on August 14, 1961. On that date, he avers, he took up residence in California with the intention of abandoning his foreign domicile and establishing his permanent home here. Admitted as a foreign student, petitioner was thereafter authorized to remain in the United States until his education was completed.

Petitioner entered San Jose State College, and graduated in June 1966 with a bachelor's degree in Industrial Relations and Personnel Management. He was then admitted to the School of Law of the University of Santa Clara, and graduated with a law degree in June 1969. In September 1969 he took and passed the California Bar Examination.

Since that time petitioner has been employed as a law clerk by a California law firm, and has married an American citizen. By reason of that marriage he was granted the status of permanent resident alien on September 5, 1971, and will be eligible for naturalization in September 1974.

I

The sole basis for respondent's refusal to certify petitioner to this court is Business and Professions Code section 6060, which provides in subdivision (a) that among the requirements for admission to the California State Bar an applicant must "Be a citizen of the United States."[1] Petitioner

[1] See also rule II, section 22, subdivision (1), Rules Regulating Admission to Practice Law in California, following Business and Professions Code section 6068. Other prerequisites prescribed by section 6060 are that the applicant be of the age of majority and of good moral character, and have fulfilled certain qualifications relating to education, registration, and examination. A former requirement that the applicant also "Have been a bona fide resident of this State for at least two months

contends that his exclusion on the ground of alienage denies him equal protection of the law.

■ The principles governing this question were restated last term by the United States Supreme Court in the case of *Graham* v. *Richardson* (1971) 403 U.S. 365, 371-372 [29 L.Ed.2d 534, 541, 91 S.Ct. 1848]: "The Fourteenth Amendment provides, '[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' It has long been settled, and it is not disputed here, that the term 'person' in this context encompasses lawfully admitted resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside. *Yick Wo* v. *Hopkins,* 118 U.S. 356, 369 (1886); *Truax* v. *Raich,* 239 U.S. 33, 39 (1915); *Takahashi* v. *Fish & Game Comm'n,* 334 U.S. [410], at 420. . . .

"Under traditional equal protection principles, a State retains broad discretion to classify as long as its classification has a reasonable basis. [Citations.] . . . But the Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority (see *United States* v. *Carolene Products Co.,* 304 U.S. 144, 152-153, n. 4 (1938)) for whom such heightened judicial solicitude is appropriate. Accordingly, it was said in *Takahashi,* 334 U.S., at 420, that 'the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits.' " (Fns. omitted.)

We recognized these same principles in *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578-579 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194], concluding that discrimination on the basis of alienage "invokes a strict standard of review." We observed that because of the ever-present risk of prejudice "a special mandate compels us to guard the interests of aliens"; that "particular alien groups and aliens in general have suffered from such prejudice. Even without such prejudice, aliens in California, denied the right to vote, lack the most basic means of defending themselves in the political processes. Under such circumstances, courts should approach discriminatory legislation with special solicitude." (Fns. omitted; *id.* at p. 580.) (Accord, *Sei Fujii* v. *State of California* (1952) 38 Cal.2d 718, 730-731 [242 P.2d 617].)

It is not only the *basis* of the discrimination—alienage—which prompts

immediately prior to the date of his final bar examination" was deleted by the Legislature in 1970. (Stats. 1970, ch. 251, p. 513, § 1.)

the concern of the courts: no less significant is the *method* by which that discrimination is often practiced, i.e., by totally excluding aliens from engaging in certain occupations. Thus in *Purdy & Fitzpatrick* we admonished that "the state may not arbitrarily foreclose to any person the right to pursue an otherwise lawful occupation. Any limitation on the opportunity for employment impedes the achievement of economic security, which is essential for the pursuit of life, liberty and happiness; courts sustain such limitations only after careful scrutiny." (Fn. omitted.) (71 Cal.2d at p. 579; see also *id*. at p. 580, fn. 30; accord, *Sei Fujii* v. *State of California* (1952) *supra*, 38 Cal.2d 718, 736 [242 P.2d 617].)

Over the years the United States Supreme Court has invoked these principles to strike down, as violations of equal protection of the law, state statutes excluding aliens from a variety of occupations. (See, e.g., *Yick Wo* v. *Hopkins* (1886) *supra*, 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064] (operating a public laundry); *Truax* v. *Raich* (1915) *supra*, 239 U.S. 33 [60 L.Ed. 131, 36 S.Ct. 7] (requirement that four out of five employees be citizens); *Takahashi* v. *Fish & Game Comm'n* (1948) *supra*, 334 U.S. 410 [92 L.Ed. 1134, 68 S.Ct. 731] (commercial fishing in California offshore waters).) More recently, the courts have extended this constitutional protection both to occupations and to the receipt of governmental social benefits. Thus in *Purdy & Fitzpatrick* we declared unconstitutional an exclusion of aliens from employment on public works. In *Graham* v. *Richardson* (1971) *supra*, 403 U.S. 365 [29 L.Ed.2d 534, 91 S.Ct. 1848], the United States Supreme Court invalidated statutes of two states denying welfare benefits to persons who are not citizens or, if aliens, have not resided in this country for 15 years. In *Chapman* v. *Gerard* (3d Cir. 1972) 456 F.2d 577, the circuit court held unconstitutional an exclusion of alien students from a public scholarship fund. In *Dougall* v. *Sugarman* (S.D.N.Y. 1971) 330 F.Supp. 265 (subsequent opn. by three-judge court (S.D.N.Y. 1971) 339 F.Supp. 906, prob. juris. noted 407 U.S. 908 [32 L.Ed.2d 682, 92 S.Ct. 2434]) the district court held that a state statute preventing aliens from applying for competitive civil service positions offended the equal protection clause. And in *Hosier* v. *Evans* (D. Virgin Islands 1970) 314 F.Supp. 316, that clause was invoked to strike down a refusal to enroll the children of alien temporary workers in the local public school system.

As authority for the proposition that the state may not arbitrarily deny any person the right to engage in "an otherwise lawful occupation," our opinion in *Purdy & Fitzpatrick* (71 Cal.2d at p. 579, fn. 27) cites *Konigsberg* v. *State Bar* (1957) 353 U.S. 252 [1 L.Ed.2d 810, 77 S.Ct. 722]. That case, together with its companion, *Schware* v. *Board of Bar Examiners*

(1957) 353 U.S. 232 [1 L.Ed.2d 796, 77 S.Ct. 752], established the principle, which is controlling here, that a person who seeks to enter upon the occupation of a lawyer comes clothed with the protections of the Fourteenth Amendment. Thus in *Schware* (at pp. 238-239 [1 L.Ed.2d at pp. 801-802]) the high court explained that "A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. [Citations.] A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have *a rational connection with the applicant's fitness or capacity to practice law*. [Citations.] Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church. Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory. Cf. *Yick Wo* v. *Hopkins,* 118 U.S. 356." (Fn. omitted; italics added.) And in *Konigsberg* the court reiterated (at p. 273 [1 L.Ed.2d at p. 825]) that "We recognize the importance of leaving States free to select their own bars, but it is equally important that the State not exercise this power in an arbitrary or discriminatory manner. . . . A bar composed of lawyers of good character is a worthy objective but it is unnecessary to sacrifice vital freedoms in order to obtain that goal."

On these grounds a growing number of federal district courts have recently struck down statutes requiring that an applicant to the bar be a resident of the state in question for a specified period of time prior to seeking admission. (*Potts* v. *The Honorable Justices of the Supreme Court of Hawaii* (D.Hawaii 1971) 332 F.Supp. 1392; *Lipman* v. *Van Zant* (N.D. Miss. 1971) 329 F.Supp. 391, 400-401; *Webster* v. *Wofford* (N.D.Ga. 1970) 321 F.Supp. 1259; *Keenan* v. *Board of Law Examiners of State of N.C.* (E.D.N.C. 1970) 317 F.Supp. 1350; but see *Suffling* v. *Bondurant* (D.N.M. 1972) 339 F.Supp. 257.) In each of these decisions the court held that the residence requirement bore "no rational relationship" to the applicant's fitness to practice law, and hence constituted arbitrary and invidious discrimination in violation of the equal protection clause.

## II

The question now presented is whether the foregoing analysis also applies to the citizenship requirement of Business and Professions Code

section 6060. By way of introduction, a glimpse into the pages of history will be instructive.

The first statute regulating the practice of law in California limited membership in the bar to those who were (1) white, (2) male, and (3) citizens. (Stats. 1851, ch. 4, p. 48.) The first two qualifications remained the law of this state for a quarter of a century: several times reaffirmed by the Legislature, they were carried over into the codifications of 1872 as Code of Civil Procedure section 275. It was not until 1877 that the total exclusion of nonwhites and women was abandoned. (Amends. to Codes, 1877-1878, ch. 600, p. 99.)

Beginning in 1861, by contrast, an applicant for admission to the bar was not required to be a citizen: an alien was also eligible, provided he had in good faith declared his intention to become a citizen. (Stats. 1861, ch. 49, p. 40.) A subsequent statute provided somewhat vaguely that "If an alien, admitted to practice law, fails to become naturalized within a reasonable time after he is eligible," his license would be revoked on motion of the Attorney General. (Stats. 1923, ch. 104, p. 233, § 3; repealed by Stats. 1963, ch. 79, p. 705, § 1.) And an early decision of the California Supreme Court held that "a person of Mongolian nativity" (i.e., racially Chinese) would be denied admission to the bar because he was ineligible for citizenship. (*In re Hong Yen Chang* (1890) 84 Cal. 163 [24 P. 156].)

Nevertheless, within these limitations aliens were admitted to the California bar for a period of 70 years. (See, e.g., *Howden* v. *State Bar* (1929) 208 Cal. 604 [283 P. 820].)[2] This situation prevailed in California until 1931, when the State Bar Act was amended to restrict membership, as in the early years of our statehood, to United States citizens. (Stats. 1931, ch. 861, p. 1761.)

In *Purdy & Fitzpatrick* we reiterated the now-settled rules that in reviewing a discriminatory statute based on alienage, "Not only must the classification reasonably relate to the purposes of the law, but also the state must bear the burden of establishing that the classification constitutes a necessary means of accomplishing a legitimate state interest, and that the

---

[2] At the national level, alien attorneys were significant figures on the legal scene throughout at least the first half of our history: as the United States Supreme Court observed in *Bradwell* v. *The State* (1872) 83 U.S. (16 Wall.) 130, 139 [21 L.Ed. 442, 445], "Certainly many prominent and distinguished lawyers have been admitted to practice, both in the State and Federal courts, who were not citizens of the United States or of any State." For statistics on the role played by immigrants in the professions, as well as the arts, sciences and industry in the 18th and 19th centuries, see John F. Kennedy, *A Nation of Immigrants* (1964) page 66.

law serves to promote a compelling state interest." (Fns. omitted.) (71 Cal.2d at p. 579.) We must measure against those rules the various state interests which respondent contends are served by the statute now before us. There are, we are told, five such interests:

1. *A lawyer must "appreciate the spirit of American institutions."* While laudable in intent, this subjective requirement has limited pragmatic effect. ■ It cannot constitutionally authorize exclusion from the practice of law on the ground that the applicant holds particular beliefs concerning American institutions, however unorthodox those views may appear to the bar examiners: "The First Amendment's protection of association prohibits a State from excluding a person from a profession or punishing him solely because he is a member of a particular political organization or because he holds certain beliefs." (*Baird* v. *State Bar of Arizona* (1971) 401 U.S. 1, 6 [27 L.Ed.2d 639, 646-647, 91 S.Ct. 702]; accord, *Konigsberg* v. *State Bar* (1957) *supra,* 353 U.S. 252.) ■ Indeed, those beliefs may not even be a permissible subject of inquiry: "when a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment." (*Baird* v. *State Bar of Arizona, supra,* at p. 6 [27 L.Ed.2d at p. 647].) ■ Although a state may be able to discharge the "heavy burden . . . to show that the inquiry is necessary to protect a legitimate state interest" as to questions concerning specific prior acts of the applicant, the latter's "views and beliefs are immune from bar association inquisitions designed to lay a foundation for barring an applicant from the practice of law." (*Id.* at pp. 6, 8 [27 L.Ed.2d at p. 647]; accord, *In re Stolar* (1971) 401 U.S. 23, 30 [27 L.Ed.2d 657, 664, 91 S.Ct. 713].)

■ What remains, then, is the state's undoubted legitimate interest in an applicant's having a general understanding of the theory and practice of the American governmental and social system in which he must function. But there is no showing that the unvarying exclusion of aliens from admission to the bar in fact promotes that interest. Nor has it been established that aliens as a class are incapable of possessing such understanding. Knowledge of this kind is acquired in many ways, both formal and informal. It comes not so much from the accident of birth as from the experience of the daily life of the community and the role of government in that life. These manifestations unfold to everyone who has lived in America or taken an active interest in the American scene. And there is no prescribed minimum number of years that a person must reside in the United States in order thus to "appreciate" our institutions. Alexis de Tocqueville, after all, lived here for less than a year and never became an American citizen.

For a contemporary example we need only look to the case of the present petitioner. As noted above, he settled in California over a decade ago with the intent of becoming a permanent resident, and married an American girl; he received both his undergraduate and legal education here, and took and passed the California Bar Examination. To suggest that such a person lacks "appreciation of the spirit of American institutions" merely because he is not himself a citizen demonstrates the irrationality of excluding aliens on this ground.[3]

2. *A lawyer must take an oath to support the Constitutions of the United States and California.* ■ This requirement is prescribed by statute,[4] and is constitutionally permissible. (See, e.g., *Law Students Research Council* v. *Wadmond* (1971) 401 U.S. 154, 163-164 [27 L.Ed.2d 749, 758-759, 91 S.Ct. 720].) But its relevance must be clearly understood: an alien *can* take this oath, both legally and as a matter of fact. Respondent's position on this point is thus reduced to the claim that although an alien can take the oath, he cannot do so honestly; since he remains a national of his native land, it is argued, he cannot be loyal to the United States.

There are two answers to this contention. First, to inquire into the "loyalty" of a prospective lawyer is, for the reasons stated above, to skate on very thin constitutional ice indeed. (*Baird* v. *State of Arizona* (1971) *supra,* 401 U.S. 1; *In re Stolar* (1971) *supra,* 401 U.S. 23.) Second, we cannot say that aliens as a class are incapable of honestly subscribing to this oath. On the contrary, the United States Congress evidently believes they can do so: under federal law resident aliens may be conscripted into the armed forces of the United States (50 U.S.C. App. § 454), and in that event they take an oath declaring that they, like all other inductees, "will support and defend the Constitution of the United States of America against all enemies, foreign and domestic," and "will bear true faith and allegiance to the same" (10 U.S.C. § 502). Such an oath is an even more explicit declaration than the simple affirmation required of California lawyers. [5]

---

[3]Nor is it rational to exclude aliens on the more specific ground that because of their origin they might not "know the law" of California. That particular knowledge, obviously, can be insured by appropriate educational requirements and be tested by the California Bar Examination, as it was here. Respondent does not contend to the contrary.

[4]"Every person on his admission shall take an oath to support the Constitution of the United States and the Constitution of the State of California, and faithfully to discharge the duties of any [*sic*] attorney at law to the best of his knowledge and ability. A certificate of the oath shall be indorsed upon his license." (Bus. & Prof. Code, § 6067.)

[5]Respondent seeks to distinguish the two oaths by arguing that an applicant to the bar anticipates greater monetary rewards and far less physical danger than an

Furthermore, the courts of California have repeatedly recognized there are no rational grounds for believing that all residents who are not also citizens are ipso facto lacking in loyalty or commitment to abide by the laws of the land. "It is common knowledge that several million aliens are living in this country and that the vast majority are peaceful and law-abiding. Undoubtedly, many are serving or have children serving in the armed forces. . . . [A] person does not demonstrate instability, nor does he show a tendency towards crime, simply because he is not a citizen of this country." (*People* v. *Lovato* (1968) 258 Cal.App.2d 290, 293, 296 [65 Cal.Rptr. 638]; see also *People* v. *Satchell* (1971) 6 Cal.3d 28, 38-39 [98 Cal.Rptr. 33, 489 P.2d 1361], approving the quoted reasoning of *Lovato*.)

Again, in *Sei Fujii* v. *State of California* (1952) *supra*, 38 Cal.2d 718, this court held the California Alien Land Law to be violative of the equal protection clause. We found no reasonable relationship between the statute's claimed purpose of restricting ownership of land to persons who were loyal to the state, and the classification which excluded from such ownership all aliens "ineligible for citizenship." In support of this conclusion we explained (at pp. 732-733): "Just as eligibility to citizenship does not automatically engender loyalty or create an interest in the welfare of the country, so ineligibility does not establish a lack of loyalty or the absence of interest in the welfare of the country. Nor does it follow that a person has no stake in the economic and social fortune of a state merely because the federal law denies him the right to naturalization. His American-born children are citizens, and, having made his home here, he has a natural interest, identical with that of an eligible alien, in the strength and security of the country in which he makes a living for his family and educates his children."

Most recently, in *Purdy & Fitzpatrick* (71 Cal.2d at p. 582) we reiterated that "any classification which treats all aliens as undeserving and all United States citizens as deserving rests upon a very questionable basis. The citizen may be a newcomer to the state who has little 'stake' in the community; the alien may be a resident who has lived in California for a lengthy period, paid taxes, served in our armed forces, demonstrated his worth as a constructive human being, and contributed much to the growth and development of the state." (Fns. omitted.)

---

inductee, and hence has a stronger "motive to falsify." The argument is unworthy of respondent. To presume that the greater the prospect of financial gain, the more likely a future member of the bar of California will swear falsely, is both to demean the high purpose of the oath to support our Constitution and to cast an unwarranted aspersion upon all those who have taken that oath and now serve society as respected and honorable members of the bar.

Respondent fails to show that such persons, as a class, cannot be trusted to swear truly to support the supreme law of their adopted homeland. Nor is there the slightest indication that the present petitioner cannot honestly take such an oath. ▮ The outright exclusion of aliens, accordingly, does not in fact promote the state's interest in insuring that an applicant to the bar will defend the Constitution to the best of his ability.

3. *A lawyer must remain accessible to his clients and subject to the control of the bar.* This heading groups two concerns, both of which assertedly arise from the fact that under certain circumstances an alien may be subject to deportation or internment. To begin with, however, the possibility that an alien lawyer might voluntarily return to his native land is not significantly different, in today's highly mobile society, from the possibility that a citizen lawyer might voluntarily move to a different jurisdiction in the United States, e.g., in search of better employment opportunities. There is no showing that noncitizen members of the bar, as a class, will be more likely than citizens to make such a move without properly winding up their affairs and protecting the interests of their clients.

With respect to involuntary removal from practice, it is said that an alien lawyer is subject to deportation or internment in the event that war breaks out between the United States and his native land, or in similar situations of international emergency. But the risk of such an emergency is not foreseeable; and even if it eventuates, deportation or internment is by no means an inevitable consequence.[6] More importantly, that risk is easily outweighed by the possibility that a lawyer, even though a citizen, may be involuntarily removed from his practice by death, by serious illness or accident, by disciplinary suspension or disbarment, or by conscription. In any of the latter circumstances the client will undergo the same inconvenience of having to obtain substitute counsel.

Even less persuasive is the concern that an alien lawyer, although practicing in California, might somehow by virtue of his alienage remain beyond the control of the bar itself. Such a person would obviously not be clothed with the formal immunity of an accredited diplomat, and would be no less liable to discipline or disbarment than any citizen lawyer.

4. *"The practice of law is a privilege, not a right."* This adage is premised upon two theories, both of which have recently been rejected as outmoded by the United States Supreme Court. First, the "right-privilege" dichotomy is no longer relevant to the kind of constitutional inquiry in

---

[6]During World War II, for example, German and Italian nationals were not interned unless they were suspected of disloyalty to the United States.

which we are here engaged. In dismissing the argument that aliens can be denied welfare on the ground of the state's "special public interest" in its resources, the high court explained that the doctrine "was heavily grounded on the notion that '[w]hatever is a privilege, rather than a right, may be made dependent upon citizenship.' [Citation.] But this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' [Citations.]" (*Graham* v. *Richardson* (1971) *supra,* 403 U.S. 365, 374 [29 L.Ed.2d 534, 543, 91 S.Ct. 1848].)[7]

Second, the theory that the practice of law is a privilege and not a right—which has been invoked in the past to justify various legislative regulations of the profession (see, e.g., *Cohen* v. *Wright* (1863) 22 Cal. 293, 317, 319)—was seriously questioned by the Supreme Court in *Schware* v. *Board of Bar Examiners* (1957) *supra,* 353 U.S. 232, 239, footnote 5 [1 L.Ed.2d 796, 801]: "We need not enter into a discussion whether the practice of law is a 'right' or 'privilege.' Regardless of how the State's grant of permission to engage in this occupation is characterized, it is sufficient to say that a person cannot be prevented from practicing except for valid reasons. Certainly the practice of law is not a matter of the State's grace. *Ex parte Garland,* 4 Wall. 333, 379." Respondent seeks to minimize the effect of this language by asserting that it had "no apparent significance" in *Schware* and was there relegated to a footnote. But in *Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 452, footnote 3 [55 Cal.Rptr. 228, 421 P.2d 76], this court relied on prior opinions which "characterize a claim for admission to the bar as a claim of right entitled to the protections of procedural due process," and concluded it was "impossible for us to regard admission to the profession as a mere privilege." ▮ And the *Schware* footnote was squarely elevated to a textual holding in *Baird* v. *State Bar of Arizona* (1971) *supra,* 401 U.S. 1, 8 [27 L.Ed.2d 639, 648], when the Supreme Court said, citing *Schware* and *Garland:* "The practice of law is not a matter of grace, *but of right* for one who is qualified by his learning and his moral character." (Italics added.) Manifestly we cannot undertake to exhume legal theories so freshly and firmly buried.

5. *A lawyer is an "officer of the court" and therefore "should be a citizen."* We agree with the premise, but the conclusion remains a non

---

[7]In any event, "One may well question the justification for this distinction when applied to exclude aliens. Because an occupation may be privileged need not mean that the city or state may exclude from it anyone at all, for example, Negroes, or Catholics, or persons of Italian nativity or descent." (Konvitz, The Alien and The Asiatic in American Law (1946) p. 179.)

sequitur. The traditional expression that a lawyer is an "officer of the court" has not often been explicated. He clearly is not a public office-holder in the literal sense (*Cohen* v. *Wright* (1863) *supra,* 22 Cal. 293, 314-315), but we need not here explore the broader, metaphorical meanings of the phrase. ■ Without detracting in any degree from the high responsibility and trust placed in members of the bar and their privileged and intimate relationship with the courts of California, we perceive no demonstrable nexus between that status and a requirement that every lawyer be a United States citizen. The most that can be said is that an "officer of the court" should be able to appreciate the spirit of American institutions, subscribe to an oath to support the Constitution, remain accessible to his clients and subject to the control of the bar, and meet similar responsibilities. But these are the very grounds, as we have shown, which cannot rationally be invoked to justify the wholesale exclusion of aliens from the bar.

### III

■ We conclude that the challenged classification does not have "a rational connection with the applicant's fitness or capacity to practice law." (*Schware* v. *Board of Bar Examiners* (1957) *supra,* 353 U.S. 232, 239 [1 L.Ed.2d 796, 801-802, 77 S.Ct. 752].) A fortiori respondent has not sustained its burden of establishing that the classification—based as it is on the suspect factor of alienage—not only promotes " 'a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' " (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], and cases cited.)

Respondent relies nevertheless on a decision of this court, rendered shortly after the statutory exclusion of aliens was reenacted in 1931, which upheld that exclusion against a charge that it violated equal protection of the law. (*Large* v. *The State Bar* (1933) 218 Cal. 334 [23 P.2d 288].) The opinion in *Large,* however, merely listed without discussion several of the traditional grounds for exclusion hereinabove shown to be without merit, and relied in particular on a North Carolina case decided in 1824— i.e., 44 years before the ratification of the Fourteenth Amendment. In *Purdy & Fitzpatrick* (71 Cal.2d at p. 583) we reconsidered and overruled a contrary decision of the same vintage as *Large,* explaining that "[r]ecent developments in the law of equal protection have removed whatever vitality [the earlier cases in point] may have possessed at the time of their rendi-

tion." For the same reason the decision in *Large* no longer reflects current constitutional reality, and it is hereby overruled.[8]

Legal authors and commentators have called for an end to the exclusion of noncitizen lawyers from the bar: "In so far as admission to the practice of the professions is concerned, the statutes excluding aliens should be declared unconstitutional; because, though they profess to be measures adopted to safeguard the public safety and interest, the connection between competence and citizenship still remains to be established." (Konvitz, *op. cit. supra,* at p. 188; accord, Comment, *Aliens' Rights, the Public Interest, and the Practice of Foreign Law* (1958) 10 Stan.L.Rev. 777, 780.) Admission of such lawyers (upon their declaration of intention to become a citizen) is permitted by statute in some American jurisdictions, and in others by rule of court (*In re Chi-Dooh Li* (1971) 79 Wn.2d 561 [488 P.2d 259]). And there are judicial developments of significance: a recent decision of the Supreme Court of Alaska struck down a statutory requirement of citizenship for the practice of law in that state, on the ground that it is an unreasonable encroachment on the inherent judicial power to determine standards of admission to the bar.[9] In a well-reasoned opinion,

---

[8]The applicant in *Large* was an English solicitor who sought to qualify under a provision authorizing admission of foreign lawyers if they had been actively practicing in a common law jurisdiction for at least four of the six years immediately preceding their application to the bar of California. This provision, however, was effectively nullified by the further requirement that the applicant be a United States citizen, as the naturalization process ordinarily required five years' continuous residence in the United States. Manifestly it was physically impossible for Mr. Large to be in both places at once—in England actively practicing law and in America fulfilling his residence requirement for citizenship.

Almost four decades later, nevertheless, the same dilemma continues to face all foreign attorneys who seek to qualify under the current version of the rule invoked in *Large*. Under federal law, naturalization generally requires five years' continuous residence in the United States; yet Business and Professions Code section 6062 provides both that a foreign attorney shall be a citizen (subd. (a)) and that he "shall have been actively and substantially engaged in the practice of law in [his native country] for at least four years out of the six immediately preceding the filing of his application for admission to practice in this state" (subd. (d)). Although there may be other ways for a foreign attorney to become a citizen and other ways for him to qualify for the bar of California, the foregoing irreconcilable statutory procedure is incongruous on its face.

[9]In the case at hand, petitioner likewise contends that section 6060 is invalid as an encroachment on the judicial power. Respondent contends in reply that our power in this regard is limited to imposing *additional* requirements for admission, over and above those prescribed by the Legislature, and that the latter (including, therefore, citizenship) are minimum requirements which may not be dispensed with. (*In re Lavine* (1935) 2 Cal.2d 324, 328 [41 P.2d 161, 42 P.2d 311].) Whatever the merits of respondent's position, it is clear that the Legislature is authorized only to prescribe *reasonable* restrictions within constitutional parameters on the admission to practice. (See, e.g., *Brydonjack* v. *State Bar* (1929) 208 Cal. 439, 443 [281 P.

the Alaska court reviews in detail each of the claimed state interests discussed hereinabove, and holds that none has a "rational connection" with an applicant's fitness to practice law. (*Application of Park* (Alaska 1971) 484 P.2d 690, approved in *In re Chi-Dooh Li, supra,* at p. 260, fn. 1, of 488 P.2d.) The rationale is the same, it will be remembered, as that currently invoked by the federal courts in annulling on equal protection grounds the residence requirement for admission to the bar.[10]

The law of California today permits an alien to earn his livelihood within our state as a doctor, a dentist, a nurse, a banker, a certified public accountant, an engineer, an architect or a contractor. Moreover, the Attorney General has formally concluded under the authority of *Purdy & Fitzpatrick* that United States citizenship may not constitutionally be required of those who wish to pursue such occupations as teacher or peace officer (53 Ops.Cal.Atty.Gen. (1970) 63), pharmacist, psychologist, psychiatric technician, clinical social worker, private investigator, or insurance broker (55 Ops.Cal.Atty.Gen. (1972) 80). ▆▆▆ As the Attorney General explained, "It is well established that the purpose behind occupational licensing is to protect the public from unqualified practitioners, and it seems clear that citizenship bears no relationship to one's professional or vocational competency or qualification." (*Id.* at p. 82.)

In its own way, each of these professions is as sensitive a repository of public trust as the profession of attorney. Nevertheless an alien, however well qualified, is flatly denied the right to practice law in California by the challenged provision of the Business and Professions Code. We conclude, as in *Purdy & Fitzpatrick* (71 Cal.2d at p. 585), that "The discrimination involved denies arbitrarily to certain persons, merely because of their status as aliens, the right to pursue an otherwise lawful occupation. The classification within the statutory scheme operates irrationally without reference to any legitimate state interest except that of favoring United

---

1018, 66 A.L.R. 1507].) To determine whether the citizenship requirement is "reasonable," we must in any event make the foregoing inquiry into whether it in fact promotes any of the claimed grounds of state interest.

[10]A contrary decision of the Connecticut Supreme Court (*In re Griffiths* (1972) 294 A.2d 281, prob. juris. noted 406 U.S. 966 [32 L.Ed.2d 665, 92 S.Ct. 2413]), may be distinguished on the ground that under Connecticut law a member of the bar is much more than a lawyer in the usual sense of the word. The court stressed the fact that in Connecticut a member of the bar is ipso facto a commissioner of the superior court, has statutory power to sign writs, issue subpoenas, take recognizances and administer oaths, and is entitled to command sheriffs and constables to issue orders "by authority of the State of Connecticut." These powers, the court concluded, give members of the Connecticut bar a "unique status," with public as well as private functions in the administration of justice in that state.

States citizens over citizens of other countries. This latter objective does not reflect such a compelling state interest that it would permit us to sustain this kind of discrimination." ▉▉▉ Subdivision (a) of section 6060 offends the equal protection clauses of the United States and California Constitutions, and it is hereby declared void.

## IV

There remains the question of remedy. Although petitioner asks for an original writ of mandate, he is entitled to a writ of review under California Rules of Court, rule 59(b), and we treat his application accordingly.[11] It is not necessary to further lengthen this opinion by reciting the history of petitioner's case after he was first notified of his ineligibility due to his alien status; from a review of the petition, reply, and exhibits, we are satisfied his application was timely filed.

While admitting that petitioner has fulfilled the certification requirements relating to age, education, and passage of the California Bar Examination, respondent alleges it has not yet determined whether petitioner is "of good moral character." (Bus. & Prof. Code, § 6060, subd. (c).) To avoid undue delay, we prescribe a reasonable period within which respondent shall take whatever steps it deems necessary to make that determination.

Within 30 days after this opinion becomes final, respondent shall determine whether petitioner is of good moral character within the meaning of Business and Professions Code section 6060, subdivision (c). If petitioner is found to be of good moral character, respondent shall forthwith certify him to this court for admission to the practice of law.

Wright, C. J., McComb, J., Peters, J., Burke, J., and Sullivan, J., concurred.

---

[11]Rule 59(b) provides in part that "A petition to the Supreme Court to review any other action [i.e., other than a recommendation of disbarment or suspension] of the Board of Governors of The State Bar, or of any board or committee appointed by it and authorized to make a determination pursuant to the provisions of the State Bar Act, shall be filed within 60 days after written notice of the action complained of is mailed, postage prepaid, to the petitioner, addressed to him at his last known address appearing on the records of The State Bar." (See also Bus. & Prof. Code, § 6066.)