`

TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

| | |
|---|---|
| OPINION | No. 93-205 |
| of | |
| DANIEL E. LUNGREN<br>Attorney General | January 13, 1994 |
| ANTHONY S. Da VIGO<br>Deputy Attorney General | |

THE HONORABLE QUENTIN L. KOPP, MEMBER OF THE CALIFORNIA SENATE, has requested an opinion on the following question:

May the California State University voluntarily consider racial, ethnic, and gender characteristics in employing its faculty?

CONCLUSION

The California State University may voluntarily consider racial, ethnic, and gender characteristics in employing its faculty to remedy the effects of its own past discriminatory employment practices. Where evidence of such practices, which must be convincing, is based upon statistical disparity, the comparison must be between the composition of its faculty and the composition of the qualified population in the relevant labor market. The consideration must be closely related to the degree, nature, and extent of such prior discrimination.

ANALYSIS

We are asked to examine a proposed affirmative action plan for the hiring of faculty at a campus of the California State University. Under what circumstances may race, ethnic origin, and gender be considered in the decision-making process? We conclude that such factors may voluntarily[1] be considered under certain conditions.

---

[1]The question assumes that no court order has been issued relating to the employment of faculty at the university campus.

Constitutional Premises

We begin with the organic law of this state. California Constitution, article I, section 7, subdivision (a) provides:

"A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws . . . ."

With regard to employment practices specifically, section 8 of article I of the Constitution, having no federal counterpart, provides:

"A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin."

The State of California is also subject to the provisions of the Fourteenth Amendment to the Constitution of the United States. Section 1 thereof provides:

" . . . No state shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

As a matter of due process, it is well established that no person may be denied government employment because of factors unconnected with the responsibilities of that employment. (*Pickering* v. *Board of Education* (1968) 391 U.S. 563, 572; *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 234; 64 Ops.Cal.Atty.Gen. 837, 842 (1981).)   With respect to the equal protection of the laws, the California State University, being an agency of the State of California, "must act in accordance with a `core purpose of the Fourteenth Amendment' which is to `do away with all governmentally imposed discriminations based on race.'" (*Wygant* v. *Jackson Board of Education* (1986) 476 U.S. 267, 277, quoting *Palmore* v. *Sidoti* (1984) 466 U.S. 429, 432.)

Statutory Premises

It is the public policy of this state to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination on account of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, sex, or age. (Gov. Code, § 12920; cf. *Gay Law Students Association* v. *Pacific Telephone & Telegraph Company* (1979) 24 Cal.3d 458, 484; *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721, 739-740; 63 Ops.Cal.Atty.Gen. 457, 460 (1980).)[2]  The opportunity to seek, obtain, and hold employment without such discrimination is expressly declared to be a civil right. (§ 12921; 64 Ops.Cal.Atty.Gen. 728, 730 (1981).)  In order to effectuate such right, section 12940, part of the California Fair Employment and Housing Act, provides in part as follows:

"It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification . . .

"(a) For an employer, because of race, religious creed, color, national origin, . . . or sex of any person, to refuse to hire or employ the person . . . or to discriminate

---

[2]All references hereafter to the Government Code are by section number only.

against the person in compensation or in terms, conditions or privileges of employment."[3]

In 1964 the United States Congress, exercising its power to regulate interstate commerce, enacted the federal Civil Rights Act of 1964, including Title VII pertaining to employment practices.[4]  The federal law provides in pertinent part:

"It shall be an unlawful employment practice for an employer --

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."  (42 U.S.C. § 2000e-2, subd. (a).)

Affirmative Action

We now consider whether, in view of the state and federal constitutional and statutory limitations set forth above, a public employer may engage in voluntary affirmative action programs which are inherently race-conscious.  (Cf. *Steelworkers* v. *Weber* (1979) 443 U.S. 193, 201-202; *Price* v. *Civil Service Commission* (1980) 26 Cal.3d 257, 272-273.)[5]  It is assumed for purposes of this analysis that the plan in question is not based on a "reflexive adherence to a numerical standard" or "quota."  (Cf. *Johnson* v. *Transportation Agency* (1987) 480 U.S. 616, 637.)[6]

In *Price* v. *Civil Service Commission*, *supra*, 26 Cal.3d 257, the California Supreme Court stated:

". . . The [*Steelworkers* v. *Weber* (1979) 443 U.S. 193] and [*University of California Regents* v. *Bakke* (1978) 438 U.S. 265] decisions teach that neither the pertinent antidiscrimination enactments nor the constitutional equal protection guarantee may properly be interpreted to prohibit a governmental employer from voluntarily implementing a reasonable race-conscious hiring program to remedy the

---

[3]The term "employer" includes the state and any political or civil subdivision thereof. (§ 12926, subd. (d).)

[4]The term "employer" for purposes of the federal law refers to a "person engaged in an industry affecting commerce . . . ."  (42 U.S.C. § 2000e, subd. (b).)  As amended by the Equal Employment Opportunity Act of 1972, "person" includes governments and governmental agencies.  (42 U.S.C. § 2000e, subd. (a).)

[5] Hereinafter, for the sake of simplicity, references to race will be understood to incorporate race, ethnicity, and gender.  The analytical principles herein applied are, for purposes of this discourse, generally the same.  (Cf. *Raffaelli* v. *Committee of Bar Examiners* (1972) 7 Cal.3d 288, 301; *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 20.)

[6]The United States Supreme Court has distinguished between "goals" that "merely authorize[] that consideration be given to affirmative action concerns when evaluating qualified applicants" and "blind hiring" or "quotas" that are derived "solely by reference to statistics."  (*Johnson* v. *Transportation Agency, supra*, 480 U.S. at 637-638.)

effects of the employer's own past discriminatory employment practices." (*Id*., at p. 262.)[7]

It is now well settled that the test of "strict scrutiny" applies to a racial preference. (*Wygant* v. *Jackson Board of Education, supra*, 476 U.S. at 273, 280.) Specifically, there must be convincing evidence to justify the conclusion that there has been prior discrimination before benign racial classifications are allowed. (*Id*., at p. 277; see *Richmond* v. *J. A. Croson Co.* (1989) 488 U.S. 469, 500 [minority-owned business preference ruled invalid where the city had not produced a strong basis in evidence for its conclusion that remedial action was necessary]; *Associated General Contractors of California, Inc.* v. *City & County of San Francisco* (9th Cir. 1987) 813 F.2d 922, 930; *Department of General Services* v. *Superior Court* (1978) 85 Cal.App.3d 273, 283.)

In *Officers for Justice* v. *Civil Service Commission* (9th Cir. 1992) 979 F.2d 721, the court, after holding that the Civil Rights Act of 1991 amending Title VII of the Civil Rights Act of 1964 does not alter existing affirmative action case law (*id*., at p. 725), stated in part:

"Public employers are permitted to use race as a factor in selecting between qualified applicants pursuant to a `narrowly tailored' affirmative action plan designed to remedy past unlawful discrimination. *United States* v. *Paradise* [(1987)] 480 U.S. 149, 167 . . . . Under the strict scrutiny of equal protection analysis, a district court's finding must exhibit a `strong basis in the evidence' that remedial action was necessary. [*Davis* v. *City and County of San Francisco* (9th Cir. 1989) 890 F.2d 1438, 1446]. Statistical evidence of disparity sufficient to support a prima facie case under Title VII may, in some cases, constitute a strong basis in the evidence for believing that a voluntary affirmative action program was required by, and consistent with, the Constitution. [*Wygant* v. *Jackson Board of Education* (1986) 476 U.S. 267, 292 (O'Connor, J. concurring); *Hazelwood School District* v. *United States* (1997) 433 U.S. 299, 307-308] . . . ." (*Id*., at p. 726; see also *Jansen* v. *City of Cincinnati* (6th Cir. 1992) 977 F.2d 238, 242.)[8]

The requirement that an affirmative action plan be "narrowly tailored" to its remedial purposes means that there must be a close connection between the degree, nature, and extent of the prior discrimination and the extent to which racial criteria are utilized to redress its effects. (*Wygant* v. *Jackson Board of Education, supra*, 476 U.S. at 280; *Department of General Services* v. *Superior Court, supra,* 85 Cal.App.3d at 284.)

---

[7]Section 12988 provides: "The [Fair Employment and Housing Commission] and the [Department of Fair Employment and Housing] may engage in affirmative actions with owners in furtherance of the purpose of this part as expressed in section 12920."

[8]Whether Title VII of the Civil Rights Act of 1964 is viewed as somewhat less restrictive than the equal protection clause insofar as voluntary affirmative action plans are concerned (see *Johnson* v. *Transportation Agency, supra*, 480 U.S. at 620, fn. 2, 627, fn. 6) is not pertinent. We are concerned here with a state agency fully subject to the requirements of the Fourteenth Amendment.

<u>Relevant Labor Market</u>

We next consider whether a state university's determination of prior discriminatory practices[9] and implementation of an affirmative action plan may be predicated upon a statistical disparity between the racial composition of its faculty and that of its student body, the general population in its service area, or some other class of persons. Are such comparisons narrowly tailored to the university's legitimate remedial purposes? In our view, comparisons to student body or general population figures would constitute "statistics without correlation [and thus] indicative of no meaningful inference or conclusion." (Cf. *Long* v. *City of Saginaw* (6th Cir. 1990) 911 F.2d 1192, 1201.)

In *Wards Cove Packing Co.* v. *Atonio* (1989) 490 U.S. 642, 650-651, the court stated:

". . . The `proper comparison [is] between the racial composition of [the jobs in question] and the racial composition of the qualified . . . population in the relevant labor market.' [*Hazelwood School District* v. *United States* (1977) 433 U.S. 299, 308.] It is such a comparison -- between the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs -- that generally forms the proper basis for the initial inquiry in a disparate-impact case. Alternatively, in cases where such labor market statistics will be difficult if not impossible to ascertain, we have recognized that certain other statistics -- such as measures indicating the racial composition of `otherwise qualified applicants' for at-issue jobs -- are equally probative for this purpose. See, e.g., *New York City Transit Authority* v. *Beazer*, 440 U.S. 568, 585 (1979)."

In *Johnson* v. *Transportation Agency, supra*, 480 U.S. at 631-632, the court stated:

". . . In determining whether an imbalance exists that would justify taking race or sex into account, a comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise . . . . Where a job requires special training, however, the comparison should be with those in the labor force who possess the relevant qualifications. See *Hazelwood School District* v. *United States*, 433 U.S. 299 (1977) . . . ." (See also *City of Richmond* v. *Croson, supra*, 488 U.S. at 501-502; *Mayor* v. *Educational Equality League* (1974) 415 U.S. 605, 620.)

Accordingly, notwithstanding any discerned need for more minority faculty role models,[10] the United States Supreme Court has never held that societal discrimination alone is sufficient to justify a racial preference; rather, it has insisted upon a showing of prior discrimination by the particular entity before allowing limited use of racial classifications to remedy such discrimination. (*Wygant* v. *Jackson Board of Education, supra*, 476 U.S. at 274-276, 288.) Thus,

---

[9]Employment practices of a public entity must have occurred after March 24, 1972, the effective date of the Equal Employment Opportunity Act of 1972, in order to be considered as a basis for legal consequences. (*Hazelwood School District* v. *United States* (1977) 433 U.S. 299, 309; *Hull v. Cason* (1981) 114 Cal.App.3d 344, 353-354.)

[10] "Carried to its logical extreme, the idea that black students are better off with black teachers could lead to the very system the Court rejected in *Brown* v. *Board of Education*, 347 U.S. 483 (1954) . . . ." (*Wygant* v. *Jackson Board of Education, supra*, 476 U.S. at 276.)

the essential element of prior discrimination is not only the justification for but also acts as a limitation upon a state's adoption of a race-based remedy. (*Id*., at p. 275; see *Swann* v. *Board of Education* (1971) 402 U.S. 1, 15-18.)[11] It follows that the proper comparison for determining the existence of and defining the remedy for prior discrimination by a public school is between the racial composition of the faculty and the racial composition of the qualified public school teacher population in the relevant labor market. (*Hazelwood School District* v. *United States, supra*, 433 U.S. at 308; *Wygant* v. *Jackson Board of Education, supra*, 476 U.S. at 275.)

In answer to the question presented, therefore, we conclude that the California State University may voluntarily consider racial, ethnic, and gender characteristics in employing its faculty to remedy the effects of its own past discriminatory employment practices. Where evidence of such practices, which must be convincing, is based upon statistical disparity, the comparison must be between the composition of its faculty and the composition of the qualified population in the relevant labor market. The consideration must be closely related to the degree, nature, and extent of such prior discrimination.

\* \* \* \* \*

---

[11]We do not suggest that the courts have necessarily foreclosed any governmental interest other than past discrimination as a compelling justification for affirmative action. (Cf. *Wygant v. Jackson Board of Education, supra,* 476 U.S. at 286 (conc. opn. of O'Connor, J.).) However, we have not been apprised of, and therefore do not consider, any such alternative interest, other than the discredited "role model" theory, which might provide a credible basis for a diversity hiring plan. (*Id*., at p. 288, fn.)