Filed 3/16/15

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| In re HONG YEN CHANG on Admission. | ) | S223736 |
| | ) | |
| | ) | |
| _____ | ) | |

    **THE COURT.**[*]

    We grant Hong Yen Chang posthumous admission as an attorney and counselor at law in all courts of the state of California.

    Hong Yen Chang, a native of China, came to this country in 1872 as part of an educational program to teach Chinese youth about the West. (Farkas, Bury My Bones in America (1998) p. 87 (Farkas).) Chang graduated from the Philips Academy in Andover, Massachusetts, in 1879 and earned his undergraduate degree at Yale. (*Id.* at pp. 87, 89, 93.) He went on to graduate from Columbia Law School in 1886. (*Id.* at p. 90.) He applied for admission to the New York Bar, but despite a "high marking" and unanimous recommendation from the bar examiners, he was turned down by the state supreme court in 1887 because he was not a citizen. (*In and About the City: Naturalizing a Chinaman. Hong Yen Chang's Struggles to be Admitted to the Bar*, N.Y. Times (Nov. 19, 1887) p. 8.) That same year, a New York judge issued Chang a certificate of naturalization.

---

[*] Cantil-Sakauye, C. J., Werdegar, J., Chin, J., Corrigan, J., Liu, J., Cuéllar, J., and Kruger, J.

1

(*Ibid.*)  After the New York Legislature passed a law allowing him to reapply for bar admission, Chang was admitted in 1888, becoming "the only regularly admitted Chinese lawyer in this country."  (*A Chinese Lawyer:  Hong Yen Chang and a Colored Student Admitted to the Bar*, N.Y. Times (May 18, 1888) p. 1.)

Chang then relocated to California, "where he planned to serve the large Chinese community of San Francisco."  (Farkas, *supra*, at p. 90.)  When he moved for admission to the California bar, this court observed that his motion was "made in due form" and "his moral character duly vouched for."  (*In re Hong Yen Chang* (1890) 84 Cal. 163, 164.)  At the time, however, a California statute provided that only United States citizens or persons "who have *bona fide* declared their intention to become such in the manner provided by law" could gain admission upon presentation of a license to practice law from another state.  (*Id.* at p. 165, citing Code Civ. Proc., former § 279, enacted 1872 and repealed by Stats. 1931, ch. 861, § 2, p. 1762.)  This court held that the statute "requires that they shall be persons eligible to become [citizens], as well as to have declared their intention."  (*In re Hong Yen Chang*, at p. 165.)  Observing that "courts are expressly forbidden to issue certificates of naturalization to any native of China" under the federal Chinese Exclusion Act (Act of May 6, 1882, 47th Cong., ch. 126, § 14, 22 Stat. 58, 61), we determined that the certificate of naturalization Chang had obtained in New York "was issued without authority of law, and is void, it being conceded that the holder of it is a person of Mongolian nativity."  (*In re Hong Yen Chang*, at pp. 164–165.)  The court concluded:  "Holding, as we do, that the applicant is not a citizen of the United States, and is not eligible under the law to become such, the motion must be denied."  (*Id.* at p. 165.)

Understanding the significance of our two-page decision denying Chang admission to the bar requires a candid reckoning with a sordid chapter of our state and national history.  (See McClain, In Search of Equality:  The Chinese Struggle

2

Against Discrimination in Nineteenth-Century America (1994) (McClain); Takaki, *Strangers from a Different Shore:  A History of Asian Americans* (1989) pp. 79– 131.)  The general outline of this history is recounted in *Chae Chan Ping v. United States* (1889) 130 U.S. 581 (*Chae Chan Ping*), which upheld the Chinese Exclusion Act against various legal challenges one year before our decision in *In re Hong Yen Chang*.  Reflecting then prevalent sensibilities, a unanimous high court said:

"The discovery of gold in California in 1848, as is well known, was followed by a large immigration thither from all parts of the world, attracted not only by the hope of gain from the mines, but from the great prices paid for all kinds of labor.  The news of the discovery penetrated China, and laborers came from there in great numbers, a few with their own means, but by far the greater number under contract with employers, for whose benefit they worked.  These laborers readily secured employment, and, as domestic servants, and in various kinds of outdoor work, proved to be exceedingly useful.  For some years little opposition was made to them, except when they sought to work in the mines, but, as their numbers increased, they began to engage in various mechanical pursuits and trades, and thus came in competition with our artisans and mechanics, as well as our laborers in the field.  The competition steadily increased as the laborers came in crowds on each steamer that arrived from China, or Hong Kong, an adjacent English port.  They were generally industrious and frugal.  Not being accompanied by families, except in rare instances, their expenses were small; and they were content with the simplest fare, such as would not suffice for our laborers and artisans.  The competition between them and our people was for this reason altogether in their favor, and the consequent irritation, proportionately deep and bitter, was followed, in many cases, by open conflicts, to the great disturbance of the public peace.

"The differences of race added greatly to the difficulties of the situation. . . . [T]hey remained strangers in the land, residing apart by themselves, and adhering to the customs and usages of their own country. It seemed impossible for them to assimilate with our people, or to make any change in their habits or modes of living. As they grew in numbers each year the people of the coast saw, or believed they saw, in the facility of immigration, and in the crowded millions of China, where population presses upon the means of subsistence, great danger that at no distant day that portion of our country would be overrun by them, unless prompt action was taken to restrict their immigration. The people there accordingly petitioned earnestly for protective legislation." (*Chae Chan Ping*, *supra*, 130 U.S. at pp. 594–595.)

Hostility toward Chinese labor, together with cultural tensions and xenophobia, prompted the California Legislature to enact a raft of laws designed to disadvantage Chinese immigrants. (See, e.g., Stats. 1880, ch. 116, § 1, p. 123 [establishing commercial fishing ban for "aliens incapable of becoming electors of this State"]; Pen. Code, former §§ 178, 179, added by Amends. to Codes 1880, ch. 3, §§ 1, 2, pp. 1, 2 [imposing criminal liability on corporations that employed Chinese workers]; Stats. 1862, ch. 339, § 1, p. 462 [creating "the Chinese Police Tax" in order "to protect Free White Labor against competition with Chinese Coolie Labor, and to discourage the Immigration of the Chinese into the State of California"]; Stats. 1855, ch. 174, § 1, p. 216 [imposing license tax on each foreigner who was "ineligible to become a citizen"].) Many of the era's discriminatory laws and government actions were upheld by this court. (See, e.g., *Mott v. Cline* (1927) 200 Cal. 434; *In re Yick Wo* (1885) 68 Cal. 294, revd. *sub nom. Yick Wo v. Hopkins* (1886) 118 U.S. 356; *Ex parte Ah Fook* (1874) 49 Cal. 402, revd. *sub nom. Chy Lung v. Freeman* (1875) 92 U.S. 275; *People v. Brady*

4

(1870) 40 Cal. 198; *People v. Hall* (1854) 4 Cal. 399, 404–405; *People v. Naglee* (1850) 1 Cal. 232.)

Anti-Chinese sentiment was a major impetus for the California Constitutional Convention of 1879.  (See McClain, *supra*, at pp. 79–81 [describing the influence of the California's Workingmen's Party led by Dennis Kearney, whose slogan was "The Chinese Must Go!"].)  As ratified by the electorate in 1879, the California Constitution denied the right to vote to any "native of China" alongside any "idiot, insane person, or person convicted" of various crimes.  (Cal. Const. , art. II, § 1 as ratified 1879.)  It also included an entire article titled "Chinese," directing the Legislature to enact laws to combat "the burdens and evils" posed by Chinese immigrants, including laws "to impose conditions upon which persons may reside in the State, and to provide the means and mode of their removal from the State."  (*Id.*, art. XIX, § 1 as ratified 1879.)  The article specifically prohibited any corporation or government entity from "employ[ing] directly or indirectly, in any capacity, any Chinese or Mongolian," and directed the Legislature to "pass such laws as may be necessary to enforce this provision." (*Id.*, art. XIX, § 2 as ratified 1879.)

When the Legislature convened in 1880, it took up its new constitutional duties "with enthusiasm" in a session that "prove[d] to be the most Sinophobic in the state's history."  (McClain, *supra*, at p. 83; see *id.* at pp. 83–93 [discussing anti-Chinese laws enacted in 1880]; see *In re Ah Chong* (C.C.D. Cal. 1880) 2 F. 733, 733–734 [same].)  The laws enacted that session included "An Act to prohibit the issuance of licenses to aliens not eligible to become electors of the State of California," which provided that "[n]o license to transact any business or occupation shall be granted or issued by the State, or any county or city, or city and county, or town, or any municipal corporation, to any alien not eligible to become an elector of this State."  (Stats. 1880, ch. 51, § 1, p. 39.)

5

The 1879 Constitution also directed the Legislature to "provide the necessary legislation to prohibit the introduction into this State of Chinese" going forward and to "discourage their immigration by all the means within its power." (Cal. Const., art. XIX, § 4, as ratified in 1879.)  This provision continued the state's decades-long policy of opposing Chinese immigration.  (See, e.g., 2 Willis & Stockton Debates and Proceedings, Cal. Const. Convention 1878–1879, p. 739; Sen. Conc. Res. No. 25, Stats. 1874 (1874 Reg. Sess.) res. ch. 29, p. 979; Assem. Conc. Res. No. 3, Stats. 1872 (1872 Reg. Sess.) res. ch. 20, p. 970; Stats. 1862, ch. 339, p. 462; Stats. 1858, ch. 313, p. 295.)

The United States Supreme Court, in upholding the Chinese Exclusion Act, observed that California's advocacy played a key role in motivating Congress to pass the law:  "In December, 1878, the convention which framed the present constitution of California, being in session, took this subject up, and memorialized Congress upon it, setting forth, in substance, that the presence of Chinese laborers had a baneful effect upon the material interests of the State, and upon public morals; that their immigration was in numbers approaching the character of an Oriental invasion, and was a menace to our civilization; that the discontent from this cause was not confined to any political party, or to any class or nationality, but was well nigh universal; that they retained the habits and customs of their own country, and in fact constituted a Chinese settlement within the State, without any interest in our country or its institutions; and praying Congress to take measures to prevent their further immigration.  This memorial was presented to Congress in February, 1879.  [¶]  So urgent and constant were the prayers for relief against existing and anticipated evils, both from the public authorities of the Pacific coast and from private individuals, that Congress was impelled to act on the subject." (*Chae Chan Ping*, *supra*, 130 U.S. at pp. 595–596.)  This was the historical context in which this court denied Chang admission to the bar.

6

More than a century later, the legal and policy underpinnings of our 1890 decision have been discredited. In 1972, this court unanimously held it was "constitutionally indefensible" to forbid noncitizens to practice law, calling such a ban "the lingering vestige of a xenophobic attitude" that "should now be allowed to join those anachronistic classifications among the crumbled pedestals of history." (*Raffaelli v. Committee of Bar Examiners* (1972) 7 Cal.3d 288, 291.) One year later, the high court reached the same conclusion. (*In re Griffiths* (1973) 413 U.S. 717.) In 2013, our Legislature passed a law making undocumented immigrants eligible for admission to the State Bar. (Bus. & Prof. Code, § 6064, subd. (b).) We thereafter granted admission to an undocumented immigrant who had been brought to the United States as a child, put himself through college and law school, passed the California bar exam, and met the requirement of good moral character. (*In re Garcia* (2014) 58 Cal.4th 440, 466.) We said "the fact that an undocumented immigrant is present in the United States without lawful authorization does not itself involve moral turpitude or demonstrate moral unfitness so as to justify exclusion from the State Bar, or prevent the individual from taking an oath promising faithfully to discharge the duty to support the Constitution and laws of the United States and California." (*Id.* at p. 460.)

In addition, Congress repealed the Chinese Exclusion Act in 1943 (Act of Dec. 17, 1943, Pub. L. No. 78–199, 57 Stat. 600), and both Houses of Congress have recently expressed regret for the act and similar laws discriminating against Chinese immigrants (H.Res. No. 683, 112th Cong., 2d Sess. (2012); Sen.Res. No. 201, 112th Cong., 1st Sess. (2011).) The anti-Chinese provisions of the California Constitution were repealed in 1952. (Cal. Const., former art. XIX, repealed by initiative, Prop. 14, Gen. Elec. (Nov. 4, 1952).) In 2014, our Legislature adopted a resolution acknowledging California's history of discrimination against its Chinese population. (Sen. Joint Res. No. 23, Stats. 2014 (2013–2014 Reg. Sess.)

res. ch. 134.)  Among its findings, the resolution observed that "California's stance against the Chinese community influenced the promotion and passage of the federal Chinese Exclusion Act"; that "California lobbied Congress for years to strictly prohibit immigration from China"; and that "[t]he Chinese Exclusion Act set the precedent for racist foreign and national policy that led to broader exclusion laws and fostered an environment of racism that quickly led to the Jim Crow laws of the 1880s." (*Ibid*.)  While commending Congress on its recent resolutions expressing regret for the Chinese Exclusion Act, the resolution called on Congress to issue "a formal apology for the legalized governmental mistreatment marked by the Chinese Exclusion Act." (*Ibid*.)

In light of these developments, it is past time to acknowledge that the discriminatory exclusion of Chang from the State Bar of California was a grievous wrong.  It denied Chang equal protection of the laws; apart from his citizenship, he was by all accounts qualified for admission to the bar.  It was also a blow to countless others who, like Chang, aspired to become a lawyer only to have their dream deferred on account of their race, alienage, or nationality.  And it was a loss to our communities and to society as a whole, which denied itself the full talents of its people and the important benefits of a diverse legal profession.

More than a century later, Chang's descendants and the Asian Pacific American Law Students Association at the University of California, Davis School of Law have sought to right this wrong.  Even if we cannot undo history, we can acknowledge it and, in so doing, accord a full measure of recognition to Chang's pathbreaking efforts to become the first lawyer of Chinese descent in the United States.  The people and the courts of California were denied Chang's services as a lawyer.  But we need not be denied his example as a pioneer for a more inclusive legal profession.  In granting Hong Yen Chang posthumous admission to the

8

California Bar, we affirm his rightful place among the ranks of persons deemed qualified to serve as an attorney and counselor at law in the courts of California.